UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | |
|---|---|
| **D. LEE HARBULA,** | |
| **Plaintiff** | |
| **V.** | **CAUSE NO. 4:11-CV-054 RLY-WGH** |
| **AMERICAN ELECTRIC POWER,** | |
| **Defendant** | |

### MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendant, American Electric Power ("AEP"), by counsel, submits the following memorandum in support of its motion for summary judgment on Plaintiff's claims of age and disability discrimination.

### BACKGROUND

**A.     AEP and Tanners Creek Power Generating Plant**

D. Lee Harbula was an employee of AEP's Tanners Creek Plant in Lawrenceburg, Indiana ("Tanners Creek").[1]  *See* Amend. Compl.  Tanners Creek is an electric generating power plant that burns eastern coal and powder river basin ("PRB") coal.  Pl. Depo. attached as **Ex. A**, pp. 60-61.  PRB coal is cleaner burning, but it is softer and dustier, making it more combustible.  *Id.*; Dawson Aff. attached as **Ex. B**, ¶ 5.  Thus, fires are a regular and constant threat.  *Id.*  When a fire erupts, an internal team of trained first-responder personnel is charged with immediately protecting employees and the plant equipment.  *Id.*

---

[1] Plaintiff incorrectly identified AEP as the employer.  Plaintiff was employed by Indiana Michigan Power Company, which is one of numerous wholly owned subsidiaries of American Electric Power Company, Inc., that are collectively referred to as the "AEP System."  System wide, AEP employs approximately 19,000 employees in eleven states.  *See* www.aep.com.

Tanners Creek[2] has four separate coal fired generating units totaling 995 megawatts of electricity output.  Dawson Aff. ¶ 8.  Each generating unit has its own control room in which Unit Operators ("UO") operate and monitor a complex array of switches, dials, and instruments for a boiler, turbine, generator and other associated power generation equipment.  *Id.* at ¶ 10.  The Equipment Operators ("EO") work in the plant checking and operating various equipment under the direction of UOs.  Pl. Depo. pp. 59-60, 62; Dawson Aff. at ¶ 11.  Because of the increased risk of fire, the EO job description requires that EOs "train for and carry out assignments in fire fighting, first aid and other emergency programs as required," also called the "Fire Brigade."  Pl. Depo. at 62; *see* Ex. 1 to Pl. Depo.; Dawson Aff. ¶ 7.

**B.      The Fire Brigade**

In the AEP System, having a fire brigade at a power plant that burns PRB coal is considered necessary to protect plant equipment and materials, and to provide a safe work environment.  *See* Kovach Aff. attached as **Ex. C**, ¶ 6.  The Tanners Creek's Fire Protection Manual states:

> The establishment of an industrial fire brigade offers a means for the plant to take action during the vital first minutes of an on-site-emergency, e.g. fire, rescue.  It offers a resource of individuals most familiar with processes, equipment, and materials involved in a fire.  The fire brigade's primary function is to perform fire fighting operations prior to the arrival of the outside fire department(s), if needed.

Ex. 4 to Pl. Depo., Sec. 1.0.

AEP's Fire Brigade policies and procedures were developed at the corporate level consistent with the Occupational Safety and Health Act and its regulations ("OSHA"), and with guidelines set forth by the National Fire Protection Association ("NFPA").  *See* Answer to 2nd

---

[2] As of January 1, 2010, Tanners Creek employed 168 people, which included 48 people in the Operations Department.  Dawson Aff. ¶ 9.

Set of Interrog., Interrog. No. 1, attached as **Ex. D**; 29 C.F.R. § 1910.156, attached as **Ex. E**; 29 C.F.R. § 1910.134, attached as **Ex. F**; NFPA 600, 1582 (Chpt. 6), and 1710.[3]  Pursuant to OSHA, Fire Brigade members must be medically qualified to wear a self-contained breathing apparatus ("SCBA"), and they wear or carry between 50 to 80 pounds of fire protection gear. *Id*.; Pl. Depo. pp. 63-64; Ex. 2 to Pl. Depo.; Ex. 4 to Pl. Depo., Sec. 7.2 ("Fire brigade members shall wear [SCBA] while working inside buildings or confined spaces where toxic products of combustion or oxygen deficiency may be present").

In accordance with OSHA and NFPA guidelines, Section 8 of AEP's Respiratory Protection Policy requires a medical evaluation and a written medical determination of an employee's ability to wear an SCBA.  *See* Ex. 3 to Pl. Depo., pp. 10-11. The initial medical evaluation consists of the AEP respirator use questionnaire[4] and blood pressure measurement. *Id*.  When another physician makes a determination, the exam results must still be sent to the AEP contract physician for review and final approval.  *Id*.

OSHA permits employer fire brigades, and in AEP's business opinion, the Fire Brigade provides a layer of protection to people and resources that the Lawrenceburg Fire Department ("LFD") or other local fire departments cannot solely provide.[5]  *See* 29 C.F.R. § 1910.156; Kovach Aff. ¶ 7; Ex. 4 to Pl. Depo., Sec. 1.0.  The Fire Brigade members are trained and capable of immediately responding to industrial fires.  Kovach Aff. ¶ 8.  Until 2005, the LFD was mostly volunteer; it now has 6 full-time and 30 part-time fire fighters.  Tremain Aff. attached as **Ex. H**, ¶ 5.  LFD members are trained for light commercial and residential fires; they are not regularly

---

[3] The NFPA is the leading advocate of fire prevention and an authoritative source on public safety.  *See* www.nfpa.org.  The NFPA standards are also referenced in the OSHA regulations.  *See e.g.*, 29 C.F.R. § 1910.156(e)(3)(ii) (regarding fire brigades).
[4] This questionnaire is required by OSHA.  *See* 29 C.F.R. § 1910.134(e) and Appendix C thereto.
[5] Fire Brigade Fire Chief, Jeff Darling, testified that the LFD was called only if needed, depending upon the size of the fire and the manpower available.  Darling Depo. attached as **Ex. G**, pp. 16-17.

trained to fight coal or industrial fires.  *Id*. at ¶ 6.

Furthermore, Tanners Creek is roughly 60 years old, very large, contains underground coal tunnels, and has three stories underground.  Dawson Aff. ¶¶ 8, 12.  The LFD members do not know Tanners Creek, its layout, and important locations.  Tremain Aff. ¶ 13.  In an emergency, the LFD requires the assistance of the Fire Brigade to lead LFD members in and out of the plant.  *Id*.  In fact, LFD Fire Chief, Johnnie Tremain, stated:

> I cringe every time we get a call from Tanners Creek.  Residential fires are very different from industrial – especially coal – fires. Even the local distillery has an emergency response team.  It's a benefit for the Lawrenceburg Fire Department to have these industrial emergency response and fire fighting teams.
>
> We train at Tanners Creek two times a year, but we don't know the plant.  We can have maps and drawings, but those aren't helpful in case of an emergency.  If there was a fire, we would still need plant personnel directing us – guiding us in and out, and showing us where things are, such as shut-off valves.  **Even then, the plant personnel would be required to wear the SCBA.**

*Id*.  at ¶¶ 12-13 (emphasis added).

## C.    Reduction in AEP's Workforce

In April 2010, due to the economy, AEP headquarters in Ohio announced system-wide that it was reducing its workforce at several plants.[6]  Dawson Aff. ¶ 13.  By offering a voluntary severance plan, Tanners Creek reduced its workforce by 32 employees.  *Id.*  In mid-May 2010, AEP announced that several generating units across the AEP System were expected to operate only 5% of the time.  *Id.* at ¶ 14.  Tanners Creek Units 1 and 2 were affected by the reduction, and staff had to be reorganized and downsized as these units would not be fully staffed.  *Id.*

AEP management met with Union representatives to discuss the restructuring.  *Id.* at ¶ 15; Caswell Depo. attached as **Ex. I**, p. 7-11.  Negotiations in late May 2010 resulted in a

---

[6] The reduction in force affected facilities in several states, but this brief focuses solely on Tanners Creek.

"Restructuring Agreement" that was ratified by Union members on June 1, 2010.  Dawson Aff. ¶ 15; Ex. 2 to Dawson Aff.

In the Operations Department ("Ops. Dept."), UOs were reduced to 12, and EOs were reduced to 20.  Dawson Aff. ¶ 16.  Thirteen Ops. Dept. employees were reclassified to other positions.  *Id.* at ¶ 16.  As a result of the reduced workforce, effective June 1, 2010, AEP requires that all of the reclassified employees[7] and all Ops. Dept. employees **must** serve on the Fire Brigade, which requires the qualification to wear the SCBA.[8]  *Id.* at ¶ 17.  Serving on the Fire Brigade is an absolute AEP requirement of those jobs as of June 1, 2010 through the present.  *Id.*

### D.      Harbula's Employment at Tanners Creek

Harbula was hired at Tanners Creek in February 2006 at age 53.  Pl. Depo. pp. 57-58.  Shortly after hire, he was promoted to EO within the Ops. Dept., the position in which he remained throughout his employment.  *Id.*  Tanners Creek is a union facility, and Harbula was a member of the Utility Workers Union of America, Local 418 (the "Union").  Dawson Aff. ¶ 18.  Harbula served on the Fire Brigade since his hire in 2006, and he knew that he must be medically qualified to wear the SCBA.  Pl. Depo. pp. 61-62, 66-69.

On January 15, 2010, Harbula participated in an annual medical evaluation, which included a CT scan, conducted by the Worker Health Protection Program ("WHPP").  Pl. Depo. p. 77.  In a letter dated January 28, 2010, the WHPP Medical Director notified Harbula that the "radiologist's report indicates that you . . . show other findings that are important (a 4.5 cm dilation of the ascending aorta; evaluate for aneurysm).  We recommend you consult with your

---

[7] The reclassified employees were required to remain on the Fire Brigade because when Units 1 and 2 operated, those individuals would return to their previous positions to operate the Units.  Dawson Aff. ¶ 17; *see* Ex. 6 to Dawson Aff., p. 45 (James Bockstiegel testifying that as of April 13, 2011, the reclassified employees had returned to operate the Units).

[8] OSHA and the NFPA guidelines govern the number of employees required for the Fire Brigade and the medical certification required for wearing the SCBA.

personal physician on an urgent basis."  Pl. Depo. p. 78; Ex. 5 to Pl. Depo.  After receiving the letter and CT Evaluation Report, Harbula visited a cardiologist, Dr. Jason A. Smith.  Pl. Depo., pp. 84-86.  Dr. Smith reviewed the January 15th CT Evaluation Report, listened to Harbula's heart, and recommended that they "wait and see."  *Id.*

On March 16, 2010, Harbula submitted to AEP the OSHA-required medical questionnaire (the "Questionnaire").  Pl. Depo. pp. 78-79; Ex. 6 to Pl. Depo.; *see* 29 C.F.R. § 1910.134(e).  Importantly, Harbula noted that he had been notified of "significant heart problems."  Ex. 6 to Pl. Depo., p. 5.  Upon receiving the CT Evaluation Report and the Questionnaire, AEP's contract occupational physician, Dr. John Cunningham,[9] by letter dated April 23, 2010, requested that Harbula call him.  Ex. 7 to Pl. Depo., p. 5.

Harbula called Dr. Cunningham sometime in early May 2010.  Pl. Depo. pp. 81-82; *see* Cunningham Depo. pp. 9-10 ("We had a frank and long, lengthy conversation.").  Based on his years of medical experience, knowledge of fire departments and SCBA use, OSHA and NFPA guidelines, his review of the CT Evaluation Report, information he learned on the call with Harbula, and his understanding of the EO job requirements, Dr. Cunningham permanently restricted Harbula from wearing the SCBA on May 12, 2010.[10]  Cunningham Depo. pp. 12, 19.

In late May, unbeknownst to Dr. Cunningham, AEP and the Union were negotiating the Restructuring Agreement.  *See supra*, p. 5; Cunningham Depo. pp. 22-23.  Because Harbula was

---

[9] Dr. Cunningham has been practicing in the occupational medicine field since 1978, and he is certified by the American College of Occupational and Environmental Medicine, the American Academy of Disability Examining Physicians, and the American Board of Independent Medical Examiners.  *See* Cunningham Depo. attached as **Ex. J**, pp. 7-8.  Dr. Cunningham was a consulting medical director to AEP from 1983 until he retired on November 19, 2011.  *Id.* at 8-10.

[10] Harbula testified that because of the unknown nature of his medical condition in February through April of 2010, Jeff Darling, Fire Chief, said "Until we know more, let's err on the safe side."  Pl. Depo. p. 98.  Jeff Darling testified, "[T]here was some concern about Lee and wearing [the SCBA]. So although we didn't have any incidents, if we would have had one, he would have been last resort.  We would not have used him unless absolutely necessary."  Darling Depo. p. 20.  Thus, because of the larger workforce and because there was no training and no fires, Harbula did not need to wear an SCBA between early February and May 12, 2010, when Dr. Cunningham disqualified Harbula from wearing an SCBA.  *Id.*

deemed by Dr. Cunningham as not medically qualified to wear the SCBA as required of the Operations positions, Harbula was exempted from the Restructuring Agreement.  Dawson Aff. ¶ 19.  AEP management involved in making this decision were:  Thomas Dawson (then age 56), Labor Relations & EEO Manager (corporate); James Bockstiegel (then age 53), Tanners Creek Energy Production Superintendent; and Tim Kerns (then age 46), Tanners Creek Plant Manager. *Id.*  AEP worked with Union representatives, but neither Harbula nor the Union were able to suggest a viable solution.  Pl. Depo. p. 99.  The only recommendation was to exempt Harbula from serving on the Fire Brigade, which AEP could not do because of the reduced workforce. *Id*. at 99-101; Dawson Aff. ¶ 20.  As a result, Harbula was notified that his employment would be terminated unless he could find another position within the AEP System.  Pl. Depo. pp. 91-92. He was placed on paid leave beginning June 1, 2010.  Dawson Aff. ¶ 20.

In a letter dated June 2, 2010, Dr. Smith wrote, "Mr. Lee Harbula was diagnosed with an ascending aortic aneurysm[11] measuring 4.6 cm in diameter  . . . .  I don't believe that this finding would prevent him from continuing his current work related duties."  Cunningham 2nd Depo. attached as **Ex. K**, p. 64;[12] *see* Ex. 3, p. 2, to Cunningham 2nd Depo; Pl. Depo. pp. 86-87. Harbula submitted Dr. Smith's letter to AEP on June 7, 2010.  *Id*.  After receiving Harbula's permission, Dr. Cunningham called Dr. Smith to discuss Harbula's medical condition. Cunningham 2nd Depo. pp. 64-65; Ex. 4 to Cunningham 2nd Depo.

On June 15, 2010, Dr. Cunningham memorialized his conversation with Dr. Smith in a memo to Tanners Creek Plant Manager, stating:

> A telephone consultation after HIPAA consent signed by Mr.
> Harbula with Dr. Jason Smith . . . was carried out on this date.  Dr.

---

[11] Dr. Cunningham described an ascending aortic aneurysm as "[b]alloon swelling of the aorta which is the largest artery in the body as it is coming out of the heart," which can burst if large enough.  Cunningham Depo., p. 8.
[12] The parties stipulated to the use of Dr. Cunningham's first deposition transcript, dated January 12, 2011 (Ex. J). *See* Cunningham 2nd Depo. pp. 7-8.

> Smith stated that for **usual activities** and **wearing SCBA equipment for short periods of time** he did not feel that [Harbula] had any restrictions in using SCBA equipment. However, upon further discussion with management, there seems to be a **higher risk of fire** because of the type of coal being utilized at Tanners Creek than at other coal burning facilities, and when a fire occurs, it can **require SCBA use for an extended period of time**. Consequently, **because [Harbula] would have to wear SCBA equipment for a prolonged period of time if such an emergency occurred, in my medical opinion, it is in Mr. Harbula's best interest that he not participate in fire brigade activities** from which he was permanently restricted by this physician after telephone consultation with him on 05/12/10.

*Id.* at 65-66; Ex. 5 to Cunningham 2nd Depo. (emphasis added).[13]

Dr. Cunningham testified in 2011[14] that Harbula's ascending aortic aneurysm posed a risk not only to his own life, but to other people as well.[15]  Cunningham Depo., pp. 11-12 (illustrating that others would have to rescue Harbula if the aneurysm burst during fire-fighting duties).  Dr. Cunningham further testified that he restricted Harbula from wearing the SCBA after talking at length with Dr. Smith in June of 2010:

> Well, we talked about – the problem with Dr. Smith and all other physicians that aren't occupational health physicians, they don't have any idea what the workplace really looks like or what it is or what the requirements are, and I doubt if he has ever been in a power plant, and I have several times.  Anyway, to make a long story short, Dr. Smith told me on the phone that he thought that Mr. Harbula could wear SCBA equipment for short periods of time but that was not my understanding of what the requirement was to be on the fire brigade and my letter speaks for itself.

Cunningham Depo., pp. 13-14.  Dr. Cunningham also testified that he sits on the Ohio Police & Fire Pension Fund Board, and Harbula would be unqualified to be a firefighter with this condition.  *Id.* at 16; Cunningham 2nd Depo. pp. 50-52, 62-63, 66-72, 80-81, 83-86.

---

[13] Dr. Smith's certified medical records are devoid of any notes regarding this phone conversation.

[14] This deposition was taken during Harbula's Union grievance.  *See* p. 11, *infra*.

[15] LFD Fire Chief, Johnnie Tremain, stated, "You don't send a person in to fight a fire if you know the person has a heath condition that may result in that individual collapsing.  It puts that person's life at risk, and it puts others' lives at risk."  Tremain Aff. ¶ 17; *see* NIOSH Death in the Line of Duty Reports attached as Ex. 1 to Tremain Aff. (reporting fire fighter deaths due to heart aneurysms).

During Dr. Cunningham's second deposition (Sept. 6, 2012), he testified that he has been through approximately 100 factories, and he had previously toured Tanners Creek.  Cunningham 2nd Depo. pp. 23-24.  Dr. Cunningham generally describes coal burning power plants as huge, dirty, very hot, and very dangerous places.  *Id*. at 21-23.  With regard to determining medical qualification for wearing an SCBA, Dr. Cunningham has had approximately 300 corporate clients over the past 34 years, many of which require SCBA use.  *Id*. at 13-14, 25 (identifying his clients to include a railroad, chemical company, large foundry, pet food manufacturer, and fire departments).  He estimates that he qualified thousands of employees to wear respirators, such as the SCBA.  *Id*. at 14-15.  Dr. Cunningham is very knowledgeable about OSHA and the NFPA guidelines governing fire brigades and SCBA use, and in the 1990s he lectured at a seminar on respirator use for the American College of Occupational and Environmental Medicine.  *Id*. at 26-29, 31-33, 38-42, 76, 82.  Dr. Cunningham testified that in the normal course of practice, he regularly reviewed literature about firefighting safety and was heavily involved with fire fighters for years.  *Id*. at 73.

With regard to Harbula's aortic aneurysm, Dr. Cunningham testified that it is unnecessary to be a cardiologist to understand that Harbula "has a near lethal lesion in his heart."  *Id*. at 50.  When asked why he did not physically examine Harbula in May 2010, Dr. Cunningham stated that it would not have changed his opinion because a "CAT scan of the chest speaks for itself."  *Id*. at 60-61.  Further, when an individual exerts himself, "all of your vessels are . . . wide open and your blood pressure goes up, your pulse goes up, and – that's your psychologic[al] response to doing heavy lifting or heavy exertions, just your normal psychological response."  *Id*. at 56-57.  For someone with an aortic aneurysm, "if the blood pressure is elevated, . . . it will accelerate the progression of the aneurysm."  *Id*. at 55.

Specifically with regard to disqualifying Harbula from wearing the SCBA, Dr.

Cunningham testified:

> I don't think it was safe for him to do that job with the SCBA
> equipment, safe to himself primarily[,] but also to others.
>
> ***
>
> Well, if [Harbula] were to collapse, that means somebody would
> have to haul him out of there, and they're already in a dangerous
> situation[,] and so then you've got several people . . . at risk.  And
> whenever you have someone in an emergency situation, you do not
> want . . . the rescuers to have to be rescued.  . . .  You want the
> rescuers to be able to . . . walk in and you want them to be able to
> walk out.  You don't want them collapsing at the scene and
> compounding the scene, compounding difficulties.
>
> ***
>
> I mean, . . . he's working in a hot environment.  It was hot before it
> caught fire and really hot now and – and, you know, visibility is
> poor, their footing is poor, the tools that they need, whether it be
> the fire ax or the hose or the sledge hammer, all heavy stuff.  I
> mean this is real heavy work.
>
> ***
>
> [When fighting a fire, Harbula] certainly can . . . maximally stress
> his cardiovascular, maximum heart rate, maximum cardiac output,
> elevated blood pressure, all those things, yes.

*Id*. at 68-69, 71-72.  Simply stated, when making an SCBA qualification determination, "The

only question I have to answer when I'm looking at this stuff is can he physically do this thing

safely for himself and others.  That's the only question I have to answer."  *Id*. at 84.

AEP gave Harbula 41 days of paid leave in which to seek an alternative position within

AEP.  Dawson Aff. ¶ 23.  Harbula applied for multiple jobs, but was not successful in finding

another position.  Pl. Depo. pp. 91-92; *see* AEP Supplemental Resp. to Interrog. No. 10, attached

as **Ex. L**.  Harbula's last day of employment at Tanners Creek was July 9, 2010.[16]  Harbula was

53 at the time of his hire in February 2006, and he was 57 at the time of his termination in July

2010.  Harbula Depo. pp. 7, 57-58; Dawson Aff. ¶ 23; Compl. (filed 5/12/11), Sec. III.

---

[16] Harbula was offered a severance package, but he declined.  Pl. Depo. p. 93.

**E.      Harbula's Union Grievance**

Claiming that he has no disability, Harbula filed a Union grievance on June 2, 2010.

Dawson Aff. ¶ 21; Ex. 3 to Dawson Aff.  During a grievance meeting on August 10, 2010,

Harbula produced a letter dated July 12, 2010, from Dr. Smith, which Harbula claimed conflicted

with Dr. Cunningham's medical opinion.[17]  *Id.* at ¶ 24; Ex. 4 to Dawson Aff.  The Union argued

that because there was conflicting medical opinions regarding Harbula's ability to safely wear

the SCBA, Harbula should be given an independent medical evaluation ("IME").  *Id.* at ¶ 25.

AEP agreed to the IME, and worked through an IME company, CIME Management, to

schedule the IME with a cardiologist, Dr. James G. Laws.  *Id.*  Harbula, however, refused to

submit to the IME.  Pl. Depo. pp. 93.  Harbula opined that because AEP selected the IME

physician, the physician was not truly independent.  *Id.* at 94; *but see* 29 C.F.R. § 1910.134 and

29 C.F.R. § 1910.156 (requiring the employer bear the burden of all costs associated with

protective gear and medical exams).

**F.      Harbula's Union Arbitration and Subsequent IME**

On April 13, 2011, Harbula's Union grievance was heard at a binding arbitration on the

issue of whether Harbula's discharge was for legitimate reasons.  Dawson Aff. ¶ 27; Ex. 10 to Pl.

Depo.  As part of the process, Dr. Cunningham was deposed, and several witnesses testified

under oath.  Dawson Aff. ¶¶ 27-28; Ex. 6 to Dawson Aff.  On June 9, 2011, the arbitrator issued

his opinion and order requiring Harbula to submit to an IME because the issue of whether he was

qualified to wear the SCBA remained unresolved.[18]  Dawson Aff. ¶ 29; Ex. 7 to Dawson Aff.

---

[17] Harbula argues that Dr. Cunningham, like all of the physicians hired by AEP, is biased against Harbula.  Pl. Depo. pp. 73-77, 94.
[18] The opinion and order stated that if Harbula was medically certified to wear the SCBA, he would be reinstated to his position, but he would receive no back pay because he had refused to submit to the IME in mid-2010.

In December 2011, Harbula submitted to an IME with Dr. Creighton B. Wright, Sr., a cardiac surgeon,[19] who opined, "Mr. Harbula cannot work on the fire brigade because his increased risk could make him a danger to himself and to others."  Dawson Aff. ¶¶ 30-31; Ex. 9 to Dawson Aff., p. 4.  As a result of Dr. Wright's opinion, AEP did not reinstate Harbula to his EO position.

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

1.   Harbula is a former employee of Tanners Creek, a PBR coal burning power generating plant.  PRB coal is very combustible, and fires are a regular and constant threat.  Amend. Compl.;  Dawson Aff. ¶ 5.

2.   In the AEP System, having a fire brigade at a power plant that burns PRB coal is considered necessary to protect plant equipment and materials, and to provide a safe work environment.  Kovach Aff. ¶ 6.

3.   In AEP's business opinion, the Fire Brigade provides a layer protection to people and resources that the LFD or other local fire department cannot solely provide.  Kovach Aff. ¶ 7; Ex. 4 to Pl. Depo., Sec. 1.0; 29 C.F.R. § 1910.156.

4.   The EO job description requires that EOs serve on the Fire Brigade.  Pl. Depo. at 62; Ex. 1 to Pl. Depo.; Dawson Aff. ¶ 7.

5.   The Fire Brigade policies and procedures are governed by OSHA and NFPA, and employees on the Fire Brigade are required by law and AEP policies to be medically certified to wear an SCBA.  29 C.F.R. § 1910.156; 29 C.F.R. § 1910.134; NFPA 600, 1582 (Chpt. 6), and 1710; Ex. 3 to Pl. Depo., pp. 10-11.

---

[19] Dr. Creighton B. Wright, Sr., is a member of Cardiac, Vascular & Thoracic Surgeons Inc., located in Cincinnati, Ohio.  Dawson Aff. ¶ 30; Ex. 8 to Dawson Aff.

6.      From 1983 to 2011, AEP contracted with Dr. Cunningham, a physician specializing in
        occupational medicine.  Dr. Cunningham has been practicing in the occupational
        medicine field since 1978, and he is certified by the American College of Occupational
        and Environmental Medicine, the American Academy of Disability Examining
        Physicians, and the American Board of Independent Medical Examiners.  Cunningham
        Depo. pp. 7-8; *see* Ex. 1 to Cunningham Depo.  Dr. Cunningham provided occupational
        medical services for approximately 300 corporate clients, many of which required SCBA
        use in their workplaces.  Cunningham 2nd Depo. pp.13-14.  Dr. Cunningham has been in
        many factories, and he toured Tanners Creek.  *Id*. at 18-19, 23-24.

7.      Dr. Cunningham qualified thousands of employees to wear respirators, and he is very
        knowledgeable about OSHA and the NFPA guidelines.  *Id*. at 26-29, 31-33, 38-42, 76,
        82.  In the normal course of practice, he regularly reviewed literature about firefighting
        safety and was heavily involved with firefighters for years.  *Id*. at 73.

8.      Dr. Cunningham determined whether AEP employees were medically qualified to wear
        an SCBA.  *Id*. at 17-18.

9.      In an emergency, even if the LFD assists the Fire Brigade, the LFD requires the
        assistance of the Fire Brigade to lead the LFD members in and out of the Tanners Creek
        plant.  Even then, the plant personnel would be required to wear the SCBA.  Tremain Aff.
        ¶¶ 12-13.

10.     Harbula was hired in February 2006 at age 53, and he worked as an EO within the Ops.
        Dept.  Pl. Depo. pp. 57-58.  Harbula served on the Fire Brigade since his hire, and he was
        aware that he must be medically qualified to wear an SCBA.  *Id* at. pp. 61-62, 66-69.

11. Between January and May, 2010, Harbula was diagnosed with an ascending aortic aneurysm measuring 4.6 c.m.  Ex. 5 to Pl. Depo.; Ex. 3, p. 2, to Cunningham 2nd Depo. Harbula notified management at Tanners Creek, who relayed the information to Dr. Cunningham.  Pl. Depo. pp. 97-98; Cunningham 2nd Depo. pp. 43-44.  Dr. Cunningham reviewed Harbula's CT Evaluation Report, talked with Harbula, and talked with Harbula's cardiologist.  Cunningham 2nd Depo. pp.62-63, 66-68.  Because of Harbula's aortic aneurysm, Dr. Cunningham medically disqualified Harbula from wearing the SCBA on May 12, 2010, and again on June 15, 2010.  Cunningham Depo. pp. 12, 19; Ex. 5 to Cunningham 2nd Depo.  In his medical opinion, Dr. Cunningham believes that Harbula cannot safely wear the SCBA because of his aortic aneurysm, and that wearing the SCBA would be a risk to Harbula and others.  Cunningham 2nd Depo. pp. 68-69.

12. In mid-May 2010, AEP announced that several generating units across the AEP System would be expected to operate only 5% of the time.  Tanners Creek Units 1 and 2 were affected by this status, and staff was reorganized and downsized.  Dawson Aff. ¶¶ 13-14.

13. The number of UOs went to 12, and EOs went to 20.  Thirteen Ops. Dept. employees were reclassified to other positions.  *Id.* at ¶ 16; *see* Ex. 2 to Dawson Aff.

14. As a result of the reduced workforce, effective June 1, 2010, AEP requires that all reclassified employees and all Ops. Dept. employees must serve on the Fire Brigade, which necessarily requires the ability to wear the SCBA.  Serving on the Fire Brigade is a requirement of the Ops. Dept. positions today.  Dawson Aff. ¶¶ 16-17.

15. Dr. Cunningham was not an employee of AEP, and he was unaware of the RIF in May 2010.  Cunningham Depo. pp. 22-23; Cunningham 2nd Depo. p. 12.

16.     Effective June 1, 2010, Harbula was removed from his EO position.  Dawson Aff. ¶ 20.

        AEP gave Harbula 41 days of paid leave in which to find another position within the AEP

        System.  Harbula applied for several positions, but he was unsuccessful in finding

        another position.  Harbula's employment at Tanners Creek was terminated on July 9,

        2010.  *Id.* at ¶ 23.  He was 57 years old at the time his employment was terminated.

        Compl. (filed 5/12/11), Sec. III.

17.     The management involved in making the decision to remove Harbula from the EO

        position were:  Thomas Dawson (then age 56); James Bockstiegel (then age 53); and Tim

        Kerns (then age 46).  Dawson Aff. ¶ 19.

18.     Harbula filed a Union grievance claiming wrongful discharge under the collective

        bargaining agreement.  *Id.* at ¶ 21.  Because documentation from Harbula's cardiologist

        differed from Dr. Cunningham's opinion, the Union requested that Harbula be given an

        IME.  In August 2010, AEP agreed to  the IME, but Harbula refused to appear for it.  *Id.*

        at ¶ 25; Pl. Depo. p. 93.

19.     Harbula's grievance was arbitrated, and the arbitrator ordered Harbula to submit to an

        IME, which he did with Dr. Creighton Wright in December 2011.  Dawson Aff. ¶¶ 27,

        29-31.  Dr. Wright opined that Harbula cannot wear the SCBA because the increased risk

        due to the aortic aneurysm makes Harbula a danger to himself and others.  *Id.*  Based on

        Dr. Wright's report, AEP did not reinstate Harbula to his former EO position.  *Id.* at ¶ 32.

## ARGUMENT

### A.     The Summary Judgment Standard

Summary judgment is appropriate if the pleadings, depositions, answers to admissions,

interrogatories, and affidavits, if any, show that "there is no genuine dispute as to any material

fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56. The court must draw all reasonable inferences in the light most favorable to the non-moving party. *Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 392 (7th Cir. 1992). The movant bears the burden of demonstrating the "absence of evidence on and essential element of the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "The nonmoving party may not, however, simply rest on the pleadings, but must demonstrate by specific factual allegations that a genuine issue of material fact exists for trial." *Povey v. City of Jeffersonville*, 2011 U.S. Dist. LEXIS 28838, *9 (S.D. Ind. 2011), citing *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 (7th Cir. 1994). Here, there is no genuine dispute as to any material fact, and AEP is entitled to a judgment as a matter of law.

### B.   Harbula's Burden Under the ADEA and the ADA

Harbula's claims arise under the Age Discrimination in Employment Act ("ADEA") and the Americans with Disabilities Act, as amended in 2009 by the Americans with Disabilities Amendments Act (hereinafter "ADA"). *See* Amend. Compl; 42 U.S.C. § 12112 *et seq*.

To survive a motion for summary judgment in a discrimination case, a plaintiff "must present evidence from which a rational trier of fact could reasonably infer that the defendant had fired the plaintiff because [he] was a member of a protected class." *Powers v. Runyon*, 974 F. Supp. 693, 701 (S.D. Ind. 1997) (citation omitted). Direct evidence is a statement, act, policy or practice that is discriminatory on its face. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985). Where the plaintiff does not have direct evidence of discrimination, the claim must be analyzed under the three-step analysis established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

First, the plaintiff bears the burden of producing sufficient evidence to prove a *prima facie* case of discrimination. *Id.; Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). If the plaintiff cannot prove a *prima facie* case of discrimination, his claim fails as a matter of law. *Id*.

If the plaintiff establishes a *prima facie* case of discrimination, the defendant must then set forth a legitimate, non-discriminatory reason for its action. *McDonnell Douglas,* 411 U.S. at 802. In this regard, the defendant is not required to do anything more than "articulate" a legitimate, non-discriminatory reason for the decision challenged by the plaintiff. If the defendant articulates a legitimate, non-discriminatory reason for its action, the plaintiff must prove that the non-discriminatory rationale was merely a "pretext" for discrimination. *Burdine,* 450 U.S. at 253. Pretext "means a dishonest explanation, a lie rather than an oddity or an error." *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000). A plaintiff cannot, however, establish "pretext" simply by challenging his employer's business judgment. *Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 823 (7th Cir. 2006). Further, a plaintiff may not show pretext by showing that an employer's decision was poor or ill-considered. *Id.* As long as the employer honestly believes its stated reason for terminating an employee, a plaintiff cannot prove pretext. *Id.* Throughout the analysis, the burden of persuasion remains at all times with the plaintiff. *Burdine,* 450 U.S. at 253.

Harbula admits that he has no direct evidence of age or disability discrimination. Pl. Depo. pp. 59, 96-97 (admitting that he never heard derogatory comments based on age or disability, and no one in management ever acted in a discriminatory manner). Because Harbula does not have any direct proof of age or disability discrimination, his claims must be analyzed under the *McDonnell Douglas* burden shifting analysis.

17

**C.    Harbula Cannot Establish a *Prima Facie* Case of Age Discrimination.**

To establish a *prima facie* case of age discrimination, Harbula must prove:  (1) he was within the protected class (over forty); (2) he was performing his job to AEP's legitimate expectations; (3) but for his age, he would not have been discharged; and (4) other similarly situated, substantially younger employees were treated more favorably.  *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009) (under the ADEA, the burden of persuasion remains on the plaintiff to demonstrate that age was the "but-for" cause of the employer's adverse action); *see Robin v. ESPO Eng'g Corp.*, 200 F.3d 1081, 1090 (7th Cir. 2000); *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 693 (7th Cir. 2000).  In the Seventh Circuit, "substantially younger is generally defined as a ten-year difference in age."  *Warpenburg v. Target Corp.*, 2007 U.S. Dist. LEXIS 79337, *21 (S.D. Ind. 2007), citing *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 322 (7th Cir. 2003).

AEP does not dispute that Harbula was over forty.  However, Harbula cannot establish a *prima facie* case of age discrimination because he could not perform the job according to AEP's legitimate expectations, age was not the "but for" cause of his termination, and no similarly situated, substantially younger employees were treated more favorably.  Without proof to the contrary, Harbula's age discrimination claim must be dismissed.

**1.    Harbula cannot meet AEP's legitimate expectations.**

If an employee cannot meet the requirements of his job, he is not performing to his employer's legitimate expectations.  *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1178-79 (7th Cir. 1997).  "If the plaintiff has other evidence of discrimination, well and good; but if he has nothing else, and is therefore totally reliant on the *McDonnell Douglas* formula, he is out of luck if he can't show that he was meeting his employer's legitimate expectations." *Id*. at 1179.  Here,

it is undisputed that since June 1, 2010, AEP requires all of the reclassified employees and all Ops. Dept. employees to serve on the Fire Brigade, which requires medical qualification to wear the SCBA.  It is also undisputed that Dr. Cunningham medically disqualified Harbula from wearing the SCBA in May and June 2010.  Thus, because Harbula cannot meet the requirements of his job, he cannot show that he was performing to AEP's legitimate expectations.

### 2.    Age was not the "but for" cause of Harbula's termination.

It is undisputed that Harbula was 53 years old at the time of hire and only 57 years old at the time of termination.  The decision makers were 56, 53, and 46, so only one of the decision makers could be considered "substantially younger."  *Balderston*, 328 F.3d at 322.  Harbula has a "tough row to hoe" because he was terminated by peers of his own age group.  *See Fairchild v. Forma Scientific, Inc.*, 147 F.3d 567, 572 (7th Cir. 1998).

Further, James Bockstiegel (age 53), Energy Production Superintendent, interviewed Harbula as part of the hiring process.  Pl. Depo. P. 58.  Mr. Bockstiegel managed the Ops. Dept., and was a decision-maker regarding Harbula's termination.  The Seventh Circuit recognizes the "same-actor inference," meaning that it is "unlikely for a person to suddenly develop a strong bias against older folks."  *Martino v. MCI Comm. Svcs., Inc.*, 574 F.3d 447, 454-55 (7th Cir. 2009).  While the "same actor inference doesn't defeat [Harbula's] claim, it's one more thing stacked against him," especially when the decision maker is just a few years younger.  *Id*. at 455.

Finally, it is undisputed that Harbula's employment was terminated because Dr. Cunningham determined that Harbula was not medically qualified to wear the SCBA.  Thus, Harbula cannot show that "his termination would not have occurred 'but for' his employer's age-based discriminatory motive."  *Warpenburg*, 2007 U.S. Dist. LEXIS 79337 at *20.

> **3.    Harbula cannot establish that similarly situated, substantially younger employees were treated more favorably.**

Harbula must also show that similarly situated, substantially younger employees were treated more favorably during the reduction in force ("RIF"). *Jordan v. City of Gary*, 396 F.3d 825, 835 (7th Cir. 2005). To establish the presence of similarly situated employees, Harbula must show that "the comparable employees are similarly situated in all respects." *Spath v. Hayes Wheels Intl.-Ind., Inc.*, 211 F.3d 392, 397 (7th Cir. 2000). "This normally entails showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating factors or mitigating circumstances as would distinguish their conduct or their employer's treatment of them." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000).

Here, Harbula has failed to identify any similarly situated, substantially younger employee who was diagnosed with a similar health condition, who is not medically qualified to wear the SCBA, and who was permitted to remain in an Operations position after June 1, 2010. Harbula compares himself only to a now 42 year-old UO who had a heart attack in the summer of 2011. Pl. Depo. pp. 52-55; Caswell Depo. p. 6-7, 14; Dawson Aff. ¶ 32. Harbula testified, however, that he has no knowledge of the severity of the employee's heart attack, the extent of damage (if any) to the employee's heart, the status of the employee's medical condition, or any releases or doctors' statements regarding the employee's health. Pl. Depo. pp. 52-55. Harbula relies upon only his lay opinion that the employee "is at a much higher risk of something happening than" Harbula. *Id*. Harbula's lay opinion is insufficient to meet his burden in establishing this element of the *prima facie* case.

The UO's position is similar to Harbula's EO position because both are in the Ops. Dept., and both now require service on the Fire Brigade and the use of the SCBA. However, the

employee's heart attack occurred in June 2011 – approximately one year after Harbula's termination.  Caswell Depo. p. 24.  At the time of Harbula's termination, the employee was in no way similarly situated.  In addition, the employee was not diagnosed with an ascending aortic aneurysm like Harbula.  *Id*.  Moreover, both the employee's physician and AEP's new contract physician, Dr. Gregory Jewell, evaluated the employee and qualified him to wear the SCBA prior to his return to work in 2011.  *Id*. at pp. 22-23.  Thus, Harbula and the employee are not similarly situated because they had different medical diagnoses, they were evaluated by different AEP doctors, and the UO was found to be qualified to wear the SCBA.

Since the RIF in 2010, there have been no UOs or EOs who have been exempted from serving on the Fire Brigade.  *Id*. at 27.  Thus, there is no evidence that substantially younger Ops. Dept. employees who were unqualified to wear the SCBA after June 1, 2010, were allowed to remain employed in their Operations positions.  Harbula's age discrimination claim therefore fails as a matter of law and should be dismissed.

### D.    Harbula Cannot Establish a *Prima Facie* Case of Disability Discrimination.

To establish a *prima facie* case of disability discrimination, Harbula must show that:  (1) he was disabled within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) AEP took an adverse employment action against him **because of** his disability or perceived disability, or AEP failed to make a reasonable accommodation for an actual disability.  *Stevens v. Ill. Dep't of Transp.*, 210 F.3d 732, 736 (7th Cir. 2000); *Serwatka v. Rockwell Automation*, 591 F.3d 957, 962 (7th Cir. 2010) (requiring plaintiff to meet the "but for" test).  Because Harbula cannot prove any elements of a *prima facie* case, his disability discrimination claim fails.

### 1.   Harbula is not disabled within the meaning of the ADA.

The ADA provides that an individual is disabled if he:  (1) has a physical or mental impairment that substantially limits at least one major life activity; (2) has a record of this type of impairment; or (3) is regarded by his employer as having such an impairment.  42 U.S.C. § 12102(1)(A)-(C).  Harbula alleges that:  (1) he was qualified to carry out the essential functions of his job; (2) AEP perceived him as having a disability; and (3) AEP terminated his employment because of his disability or a perceived disability.  Amend. Compl., ¶¶ 15-17.  Other than Harbula's bald assertions, he has produced no evidence to support his claim, and his claim fails as a matter of law.

### a.   Harbula does not have an actual disability.

An "actual" disability under the ADA means a physical or mental impairment that substantially limits one or more of an individual's major life activities.  42 U.S.C. § 12102(1)(A).  "Major life activities" include, but are not limited to:  caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.  42 U.S.C. § 12102(2)(A); *Sickels v. Central Nine Career Ctr.*, 2012 U.S. Dist. LEXIS 10522, *23-24 (S.D. Ind. 2012).

Harbula admits that he was diagnosed with an aortic aneurysm, and he repeatedly states that he can perform all of the essential functions of the EO position without any accommodation, including service on the Fire Brigade.  Amend. Compl. ¶¶ 15-16; Pl. Depo. pp. 72-73, 76, 85-87, 98-100 (stating that he should have been exempted from serving on the Fire Brigade because "that would make a sensible accommodation **if I needed an accommodation, which I personally don't believe I do**.").  Harbula neither argues that he has a disability nor is there any

evidence supporting a disability.  *Id*.  Without proof beyond bare allegations in his complaint,

Harbula's claim cannot survive summary judgment.  *Povey*, 2011 U.S. Dist. LEXIS 28838 at *9.

      Nor can Harbula's aortic aneurysm diagnosis establish the existence of an actual

disability under the ADA without proof that the impairment substantially limits a major life

activity.  *See Scott v. Turner Indus. Group, LLC*, 2011 U.S. Dist. LEXIS 120771, *16-18 (M.D.

La. 2011).  While it is AEP's opinion that Harbula cannot safely wear an SCBA because of his

aortic aneurysm, that diagnosis alone does not meet the definition of a disability.  Neither

fighting fires nor wearing an SCBA are major life activities.  For the foregoing reasons, any

purported claim by Harbula that he was actually disabled under the ADA should be dismissed.

      **b.**      **Harbula was not "regarded as" disabled by AEP.**

      The ADA also protects individuals who an employer improperly regards as disabled.

"The 'regarded as' provisions of the ADA are designed to protect against **erroneous stereotypes**

held regarding certain physical or mental impairments that are not substantially limiting in fact."

*Fox v. Toyota Motor Mfg., Ind., Inc.*, 2008 U.S. Dist. LEXIS 52826, *8 (S.D. Ind. 2008)

(emphasis added); *see Baldock v. CSX Transp., Inc.*, 2009 U.S. Dist. LEXIS 37012, *12 (S.D.

Ind. 2009).  However, where there is no evidence that the employer regarded the employee as

"unable to return to a broad class of jobs," the employee has not been regarded as disabled.  *Fox*,

2008 U.S. Dist. LEXIS 52826 at *9.  Dr. Cunningham's opinion that Harbula could not safely

wear the SCBA is not based on erroneous stereotypes – it is based on medical evidence.

      No one at AEP argues that Harbula was unqualified or unable to perform most of the

essential functions of the EO position.  Relying on Dr. Cunningham's medical opinion regarding

Harbula's aortic aneurysm and the requirements of the Fire Brigade, AEP simply stated that

Harbula could not remain in his EO position because he was medically unqualified to wear the

SCBA.  Dr. Cunningham spoke with Harbula at length regarding his health history and aneurysm diagnosis, reviewed the CT Evaluation Report, and spoke with Harbula's cardiologist, Dr. Smith. Dr. Cunningham also made inquiries with AEP management regarding the increased risk of fire at Tanners Creek due to the PRB coal.  Cunningham 2nd Depo. p. 67.  Dr. Cunningham understood that if there was a fire, Fire Brigade members at Tanners Creek might be required to wear their protective gear, including the SCBA, for extended periods of time.  *Id*. at 67-68; *see* Ex. 6 to Dawson Aff., p. 45 (Mr. Bockstiegel testifying that the most recent fire at Tanners Creek took more than 24 hours to extinguish).

There simply is no evidence that Dr. Cunningham based his medical opinion on "erroneous stereotypes."  Based on Dr. Cunningham's medical knowledge and experience (which are well documented), and the information from Harbula and his cardiologist, Dr. Cunningham determined that it was unsafe for Harbula to wear the SCBA.  Cunningham 2nd Depo. p. 68-73.  Sadly for Harbula, due to the reduced workforce after the 2010 RIF, AEP requires all reclassified employees and all Ops. Dept. employees to serve on the Fire Brigade.

Finally, Harbula was granted more than a month of paid time off in which to search for other positions within the AEP system.  There is no evidence that AEP regarded Harbula as unable to return to a broad class of jobs.  *Fox*, 2008 U.S. Dist. LEXIS 52826 at *9.  Harbula admits that he applied for approximately twenty positions, and he actually interviewed for some of the positions.  For multiple reasons, however, including his inability to wear the SCBA, Harbula was unsuccessful in obtaining another position.  *See* Ex. J.  Thus, there is no evidence that AEP regarded Harbula as disabled.

### 2. Harbula is not qualified to perform the essential functions of his job.

Even if Harbula could establish that he has an actual disability under the ADA, he must still show that he is "qualified" for his position.  A qualified individual with a disability is

defined as "an individual with a disability who, with or without a reasonable accommodation, **can perform the essential functions** of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8) (emphasis added).  The determination of "whether an individual is qualified must be made as of the time of the employment decision."  *Koshinski v. Decatur Foundry, Inc.*, 177 F.3d 599, 602 (7th Cir. 1999); *see Povey*, 2011 U.S. Dist. LEXIS 28838 at *19.  As discussed, *supra*, Harbula was medically disqualified from wearing the SCBA, which is a requirement of the Fire Brigade, and Fire Brigade service is an essential function of the Ops. Dept. positions following the 2010 RIF.

The ADA requires an employer to make a reasonable accommodation to an otherwise qualified employee unless the employer can show, *inter alia*, that the accommodation would require elimination of an essential function.  *Povey*, 2011 U.S. Dist. LEXIS 28838 at *21-22, quoting *Cochrum v. Old Ben Coal Co.*, 102 F.3d 908, 912 (7th Cir. 1996) (not a reasonable accommodation if the plaintiff would not be performing the essential functions of his position).  The factors taken into consideration when determining whether a job duty constitutes an essential function include the employee's job description, the employer's opinion, the amount of time spent performing the function, the consequences for not requiring the individual to perform the duty, and past and current work experiences.  *Ammons v. Aramark Uniform Svcs., Inc.*, 368 F.3d 809, 818 (7th Cir. 2004).

Here, it is undisputed that firefighting duties are included in the core responsibilities of the EO job description. Ex. 1 to Pl. Depo.  It is also undisputed that due to the reduced workforce, AEP requires all reclassified employees and all Ops. Dept. employees to serve on the Fire Brigade, which by law requires the ability to wear the SCBA.  In AEP's business judgment, having a fire brigade at an power generating plant that burns PRB coal is necessary to protect

25

plant equipment and materials, and to provide a safe work environment.  Kovach Aff. ¶ 6.  While the time spent actually fighting a fire might be minimal, the threat of a fire is unavoidable due to the PRB coal.  Importantly, the consequences of a major fire could be catastrophic.  Cunningham 2nd Depo. p. 68-69.  There simply is no case law requiring AEP to exempt Harbula from serving on the Fire Brigade.

Other courts have addressed disability claims when a plaintiff is unable to wear an SCBA.  *See e.g., Lusby v. Metro. Washington Airports Auth.*, 1999 U.S. App. LEXIS 18428 (4th Cir. 1999), unpublished opinion[20] (granting summary judgment to employer regarding a disability discrimination claim); *Smith v. City of Des Moines, Iowa*, 99 F.3d 1466 (8th Cir. 1996) (granting summary judgment to employer regarding age and disability discrimination claims).  For example, in *Lusby*, the plaintiff, an airport firefighter, was diagnosed with severe coronary artery disease, putting him at risk of suffering a heart attack and sudden death.  1999 U.S. App. LEXIS 18428 at *4-5.  The requirement that he be able to perform emergency response functions, including use of the SCBA, was an essential function of the plaintiff's position.  *Id.* at *3, 15-18.  The plaintiff's proposed accommodation was to be exempted from performing emergency response.  *Id.*  Because the ADA does not require an employer to hire an additional person to perform an essential function of a person's job, or to restructure essential functions to fit the skills of an individual with a disability not otherwise qualified to perform the position, the request for accommodation amounted to an exemption from the essential function.  *Id.*  Accordingly, the court found the plaintiff was not a "qualified individual with a disability."  *Id.* at *16-17.

As in *Lusby*, AEP's requirement that all employees in the Ops. Dept. after June 1, 2010, serve on the Fire Brigade is an essential function of the remaining, post-RIF jobs at Tanners

---

[20] Unpublished opinions are attached as **Ex. M**.

Creek, and medical qualification to wear an SCBA is a legal requirement to serve on the Fire

Brigade.  Because Dr. Cunningham disqualified Harbula from wearing the SCBA, he cannot

show that he was qualified to perform the essential functions of his position.

In addition, an "individual is not qualified if he presents a 'direct threat' to his own health

and safety or that of others."  *Darnell v. Thermafiber, Inc.*, 417 F.3d 657, 660 (7th Cir. 2005);

*see Knapp v. Northeastern Univ.*, 101 F.3d 473 (7th Cir. 1996) (interpreting the Rehabilitation

Act of 1973, the prototype for the ADA), *cert. denied*, 520 U.S. 1274 (1997).  The determination

that an employee poses a direct threat must be based on "a reasonable medical judgment that

relies on the most current medical knowledge and/or the best available objective evidence, and

upon an expressly individualized assessment of the individual's present ability to safely perform

the essential functions of the job."  *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 86 (2002),

citing 29 C.F.R. § 1630.2(r).  In making this assessment, the following factors are considered:

"(1) the duration of the risk, (2) the nature and severity of the potential harm, (3) the likelihood

that the potential harm will occur, and (4) the imminence of the potential harm."  *Id*.  The

Seventh Circuit has recognized "that where the plaintiff's medical condition is uncontrolled, of

an unlimited duration, and capable of causing serious harm, injury may be considered likely to

occur" – even when the plaintiff has experienced no on-the-job episodes.  *Darnell*, 417 F.3d. at

662, citing *Hutton v. Elf Atochem N. Am., Inc.*, 273 F.3d 884, 894-95 (9th Cir. 2001) (holding

that a direct threat can exist where the nature and severity of the potential harm is catastrophic,

though the likelihood that it will occur is small).

Here, based on Dr. Cunningham's reasonable medical judgment, relying on the most

current medical knowledge and/or the best available objective evidence, and upon an

individualized assessment of Harbula's ability to safely perform the essential functions of the EO job, Dr. Cunningham disqualified Harbula from wearing the SCBA.

Dr. Cunningham has been practicing medicine since 1969 and specializing in occupational medicine since 1978.  *See* FN 9, *supra*; Cunningham 2nd Depo. p. 10. Occupational medicine "is the branch of medicine that deals with the environment in the workplace."  *Id*. at 9-12.  Dr. Cunningham has had approximately 300 corporate clients over the years, and he has qualified thousands of employees for respirator use.  *Id.* at 14-15.  AEP was but one client, and Dr. Cunningham worked with AEP for almost 30 years.  *Id.* at 13, 17.  Dr. Cunningham is also very knowledgeable about OSHA and NFPA guidelines governing fire brigades and SCBA use, and he testified that in the normal course of practice, he regularly reviewed literature about firefighting safety because he was heavily involved with firefighters for years.  *Id*. at 26-29, 31-33, 38-42, 73, 76, 82.  Dr. Cunningham also understands the requirements of working in a coal burning power plant, and he had previously toured Tanners Creek.  *Id*. at 18-19.  Dr. Cunningham has a firm grasp of the requirements of the Tanners Creek Fire Brigade and the laws governing it.

With regard to Harbula and the diagnosis of his aortic aneurysm, Dr. Cunningham testified that the medical principles regarding aneurysms (what they are and what they do) have not changed over the years.  *Id.* at 72.  Dr. Cunningham testified that extreme exertion (e.g. fire-fighting) could cause Harbula's aneurysm to dissect or rupture, potentially causing death.  *Id*. at 49-51, 53, 55-57.  It is undisputed that Dr. Cunningham reviewed Harbula's CT Evaluation Report, spoke at length with Harbula, spoke at length with Dr. Smith, and Dr. Cunningham made inquiries with AEP management regarding the length of time a Tanners Creek Fire Brigade member might be required to fight a fire.  Combining all of this information with his medical

knowledge and knowledge about OSHA and the NFPA guidelines, Dr. Cunningham disqualified Harbula from wearing the SCBA due to the risk to himself and others.

There is no evidence that Dr. Cunningham did not base his decision on reasonable medical judgment, current medical knowledge, or the best available objective evidence. Moreover, there is no dispute that Dr. Cunningham engaged in an individualized assessment of Harbula's ability to safely perform the essential functions of the job. *Chevron*, 536 U.S. at 86. Harbula's aortic aneurysm will never repair itself, and Tanners Creek will never be able to alleviate the imminent threat of fire so long as it burns PRB coal. Dr. Cunningham testified that "if [Harbula] were to collapse, that means somebody would have to haul him out of there, and they're already in a dangerous situation[,] and so then you've got several people . . . at risk. And whenever you have someone in an emergency situation, you do not want . . . the rescuers to have to be rescued." *Id*. at 68-69.

Harbula simply argues that AEP should have followed Dr. Smith's opinion because he is a cardiologist, but Dr. Smith is not an occupational physician, and he does not know the workplace, the requirements of the Fire Brigade, nor OSHA and the NFPA guidelines. In the Seventh Circuit, the district court must allow the employer to "make its own determinations of substantial risk and severity of injury if they are based on reliable evidence." *Knapp*, 101 F.3d at 485. In the "midst of conflicting expert testimony regarding the degree of serious risk of harm or death, the court's place is to ensure that the exclusion or disqualification of an individual was individualized, reasonably made, and based upon competent medical evidence." *Id*. "So long as these factors exist, it will be the rare case . . . where a court may substitute its judgment for that of the [employer's] physicians." *Id*. In *Knapp*, for example, the parties' medical experts disagreed on the likelihood that Knapp would suffer another sudden cardiac death. *Id*. at 484.

The Seventh Circuit held that university's decision to disqualify Knapp from playing collegiate sports must be respected because it was supported by medical evidence. *Id*. at 485.

Similarly, citing *Knapp*, the Tennessee Court of Appeals reached the same conclusion – that the employer's decision was reasonable despite conflicting medical opinions. *Bennett v. Nissan No. Am., Inc.*, 315 S.W.3d 832, 857 (Tenn. Ct. App. 2009). In *Bennett*, the plaintiff argued that because the employer requested (paid for) the physician's medical opinion, the medical opinion was biased and unreliable. *Id*. at 856. The court found that the plaintiff provided no evidence showing that the physician's "evaluation or conclusion was not a reasonable medical judgment or that she failed to rely on the most current medical knowledge and/or the best available objective evidence." *Id*. Further the court found that the plaintiff "offered nothing more than speculation that [the physician] was a 'hired gun' for [the employer] and raised no genuine issue of material fact as to whether [the employer] acted reasonably in relying on its own doctors' medical advice." *Id*. at 858. Thus, the court held that conflicting medical opinions did not create an issue of fact where the plaintiff argued that the employer "should have followed the recommendation of one doctor over another." *Id*. at 857, citing *Knapp*, 101 F.3d at 485.

It does not matter that Harbula's cardiologist has a different opinion, "the court's place is to ensure that the exclusion or disqualification of an individual was individualized, reasonably made, and based upon competent medical evidence." *Knapp*, 101 F.3d at 485. There is simply no evidence that Dr. Cunningham's assessment was not individualized, reasonably made, and based upon competent medical evidence. In fact, Dr. Creighton Wright's IME opinion supported Dr. Cunningham's opinion. *See* Ex. 9 to Dawson Aff., p. 4. Thus, Harbula is not qualified because he presents a direct threat to his own health and safety and to that of others.

**3.     AEP did not fail to accommodate Harbula's alleged disability.**

Assuming, *arguendo*, that Harbula meets the definition of "actual" disability under the ADA, he cannot show that AEP failed to accommodate his alleged disability.  The ADA envisions no more than "a flexible, interactive process by which the employer and employee determine the appropriate reasonable accommodation."  *Rehling v. City of Chicago*, 207 F.3d 1009, 1015 (7th Cir. 2000).   For example, an employer satisfied its duty to engage in the interactive process when it examined a physician's evaluation of the employee, its managers had multiple conversations with the employee, and it considered the employee's own statements concerning which job tasks he could perform.  *Id.* at 820.  As previously discussed, however, eliminating or changing the essential functions of the job is not a reasonable accommodation under the ADA.  *Emerson v. Northern States Power Co.*, 256 F.3d 506, 514 (7th Cir. 2001).

Furthermore, employers are not required "to reassign a disabled employee to a position when such a transfer would violate a legitimate, nondiscriminatory policy of the employer," such as a collective bargaining agreement.  *EEOC v.  Humiston-Keeling, Inc.*, 227 F.3d 1024, 1029 (7th Cir. 2000); *King v. City of Madison*, 550 F.3d 598, 600 (7th Cir. 2008).  Thus, while a request for reassignment can be a reasonable accommodation within the meaning of the ADA, the violation of a seniority system is not required.  *EEOC v. United Airlines, Inc.*, 2012 U.S. App. LEXIS 4713, *6 (7th Cir. 2012).  Similarly, employers are not required to reassign disabled employees to a job for which there is a better applicant, provided it is the employer's consistent and honest policy to hire the best applicant for the particular job in question rather than the first qualified applicant.  *Id.* at *8, 11; *Humiston-Keeling, Inc.*, 227 F.3d at 1029.

Here, AEP appropriately accommodated Harbula by exempting him from serving on the Fire Brigade until AEP could no longer do so as a result of the 2010 RIF.  Harbula admits that

between early February and the end of May 2010, "AEP, [his] supervisors, [and his] fire team leaders tried several things, all of which as far as [Harbula] could tell were fine." Pl. Depo. pp. 99-100. However, after the RIF, Harbula argues that he should have been exempted from serving on the Fire Brigade. His only suggested accommodation is the removal of an essential function of the job – which is not a reasonable accommodation under the law. Moreover, to the extent Harbula argues that he was "regarded as" disabled, AEP was not required to provide a reasonable accommodation. 29 C.F.R. § 1630.9(e) (employers are not required to provide a reasonable accommodation to an individual who meets the definition of disability solely under the "regarded as" prong of the ADA).

AEP also offered Harbula paid time off in order to pursue other open positions within the AEP System. Because he was restricted from wearing the SCBA, Harbula was not qualified for several of the positions for which he applied. *See* Ex. J. He also was not eligible for some positions due to the collective bargaining agreement, and he was not minimally qualified for other positions because he did not have a science degree.[21] *Id.* Finally, Harbula was not the best candidate for yet other positions. *Id.* Thus, AEP attempted to accommodate Harbula as best it could, which is all that is required under the ADA.

> **4.     Harbula's alleged actual or perceived disability was not the "but for" cause of his termination.**

"Like the ADEA, the ADA renders employers liable for employment decisions made 'because of' a person's disability, and [the Supreme Court] construes 'because of' to require a showing of but-for causation." *Sweratka*, 591 F.3d at 962. Harbula cannot show that his termination would not have occurred but for his alleged or perceived disability.

---

[21] Harbula took some science classes in college in 1977-78, but he graduated from college with a Bachelor of Science in business management. Pl. Depo. pp. 9-10, 20, 49-50.

It is undisputed that OSHA requires the use of the SCBA for Fire Brigade service, and Dr. Cunningham disqualified Harbula from wearing the SCBA in May 2010.  It is also undisputed that prior to June 1, 2010, employees in the Ops. Dept. could be exempted from serving on the Fire Brigade, but since June 1, 2010, AEP requires all reclassified employees and all Ops. Dept. employees to serve on the Fire Brigade.  But for AEP's 2010 RIF, Harbula's employment would not have been terminated.  Thus, Harbula cannot show that his alleged disability was the "but for" cause of his termination.

  **E.**  **Harbula was terminated for legitimate, nondiscriminatory reasons.**

Assuming, *arguendo*, that Harbula could establish a *prima facie* case for either age or disability discrimination, AEP has met its burden of articulating a legitimate, non-discriminatory reason for terminating Harbula's employment.  As stated repeatedly, as of June 1, 2010, because he was medically disqualified from wearing the SCBA, Harbula was not qualified to perform an essential function of his EO position or any of the reclassified positions.  AEP requiring all reclassified employees and all Ops. Dept. employees to serve on the Fire Brigade is a legitimate, non-discriminatory requirement.  Harbula simply could not meet this requirement.  Harbula's employment was terminated only after he was unsuccessful in obtaining another position within the AEP System.  Thus, Harbula was terminated for legitimate, nondiscriminatory reasons.

  **F.**  **Harbula cannot show pretext for discrimination.**

If the Court determines that Harbula has met his *prima facie* burden and that AEP has put forward a legitimate, nondiscriminatory reason for Harbula's termination, Harbula then must show that AEP's stated reason was merely a pretext for discrimination.  *Wolf v. Buss (America) Inc.*, 77 F.3d 914, 919 (7th Cir. 1996).  To establish that an employer's reasons are pretext, an employee must show:  (1) the proffered reasons are factually baseless; (2) the proffered reasons were not the actual motivation for the discharge; or (3) the proffered reasons were insufficient to

motivate the discharge.  *Id.*  Harbula cannot prove pretext in any of the three ways established by the Seventh Circuit in *Wolf*.

First, Harbula cannot prove that the "proffered reasons are factually baseless" because the undisputed evidence shows that: (1) OSHA and AEP policies require medical certification to wear an SCBA; (2) wearing the SCBA is a requirement of serving on the Fire Brigade; (3) Harbula was diagnosed with an ascending aortic aneurysm; (4) Dr. Cunningham disqualified Harbula from wearing the SCBA due to the aneurysm; (5) AEP reduced its workforce as of June 1, 2010; and (6) following the RIF, AEP requires all reclassified employees and all Ops. Dept. employees to serve on the Fire Brigade.

Second, Harbula cannot prove the "proffered reasons were not the actual motivation for the discharge" because there is no evidence of any motivation for the termination other than Dr. Cunningham's medical opinion that Harbula could not safely wear the SCBA.

Finally, Harbula cannot prove the "proffered reasons were insufficient to motivate the discharge" because, based on Dr. Cunningham's medical opinion, AEP honestly believed that Harbula could not wear the SCBA, an essential function to all remaining Operations positions at Tanners Creek following the 2010 RIF.

No court is in a position to substitute its own conclusion for the good faith business judgment of the employer.  *Smith v. General Scanning, Inc*., 876 F.2d 1315, 1321 (7th Cir. 1989).  To show a triable issue, Harbula must show either that AEP lied about why it fired him or that its stated reasons for terminating him have no basis in fact.  *Alexander v. Wis. Dep't of Health & Family Servs.*, 263 F.3d 673, 683 (7th Cir. 2001).  Not only has Harbula failed to demonstrate that AEP's explanations are insufficient to justify his dismissal in light of Dr. Cunningham's reasoned medical opinion, but Harbula has pointed to no evidence casting doubt

on their sincerity. Moreover, with regard to the conflicting physician opinions about Harbula's ability to wear the SCBA, the question here is not whether Dr. Cunningham correctly assessed Harbula's ability to wear the SCBA based on his health condition, but whether AEP reasonably and honestly relied on Dr. Cunningham's opinion.

Harbula has not made any of the three types of showings necessary to establish that AEP's reason for terminating Harbula's employment should not be given credence. *Wolf*, 77 F.3d at 919. As the Seventh Circuit has previously stated, "No reasonable juror could believe that [AEP] embarked on a companywide restructuring, involving significant disruptions across [multiple] states merely to cover up [the employer's] illicit urge to fire [Harbula]." *Hnizdor v. Pyramid Mouldings, Inc.*, 413 Fed. Appx. 915, 918 (7th Cir. 2011) unpublished opinion, citing *Tubergen v. St. Vincent Hosp. & Health Care Ctr.*, 517 F.3d 470, 474 (7th Cir. 2008).

The Seventh Circuit has repeatedly stated that it "does not sit as a super-personnel department with authority to review an employer's business decision as to whether someone should be fired or disciplined." *Hague*, 436 F.3d at 824; *see Smith*, 876 F.2d at 1321. In the absence of direct evidence, the court "will not second-guess the business decisions made by an employer." *Michas,* 209 F.3d at 695. Thus, Harbula cannot show that AEP's stated reasons for his termination were merely pretext for discrimination, and his claims fail as a matter of law.

## CONCLUSION

Based on the foregoing, Harbula's claims for alleged age and disability discrimination fail as a matter of law, and should be dismissed with prejudice.

## TABLE OF EXHIBITS

Exhibit A:    Plaintiff's Deposition Transcript and Exhibits

Exhibit B:    Thomas Dawson Affidavit and Exhibits

Exhibit C:    Dennis Kovach Affidavit

Exhibit D:    Defendant's Answer to 2nd Interrogatories

Exhibit E:    29 C.F.R. § 1910.156 (OSHA Regs. – Fire Brigades)

Exhibit F:    29 C.F.R. § 1910.134 (OSHA Regs. – Respiratory Protection)

Exhibit G:    Jeff Darling Deposition Transcript

Exhibit H:    Johnnie Tremain Affidavit and Exhibit

Exhibit I:    Douglas Caswell Deposition Transcript

Exhibit J:    Dr. Cunningham Deposition Transcript and Exhibits, Jan. 12, 2011

Exhibit K:    Dr. Cunningham 2nd Deposition Transcript and Exhibits, Sept. 6, 2012

Exhibit L:    Defendant's Supplemental Response to Interrogatory No. 10

Exhibit M:    Unpublished Opinions